## MOFFATT v. HARDIN.

1. In action by assignees to foreclose a junior mortgage given to the deceased mortgagee by his grantee, a clerk of court, who held officially the senior mortgage given by such mortgagee, and as such made a party defendant, is not incompetent to testify to communications between himself and the deceased relating to the ownership of

the mortgaged property ; especially where he has ceased to be clerk of court and owner of the mortgage.

2. An attorney for a trust estate in a cause just ended was called upon by the trustee to draw a deed from the trustee to the *cestui que trust*, and a bond and mortgage in return, which he did without further charge, and signed his name to them as a witness. *Held*, that he might be called as a witness in a subsequent action to prove statements made at that time by the trustee to the *cestui que trust* in his hearing.

3. Parol testimony is admissible to prove contemporaneous declarations of mortgagee explaining the uses to be made of the mortgage and the conditions of its existence.

4. Parol testimony is admissible to explain a receipt.

5. From the facts of this case, a mortgage by a *cestui que trust* to her trustee *held* to be entitled to a credit for an amount then in the hands of the trustee, for which he held a receipt, and for a further amount in the hands of the clerk of court belonging to the *cestui que trust*, for which the trustee held her order.

6. The testimony of a respectable witness as to transaction of years ago should not be disregarded because of his forgetfulness of the execution of a receipt between the parties at that time.

7. The innocent assignees for value of such bond and mortgage, without notice of the credits to which the mortgagor was entitled, took these securities subject to the defences of the mortgagor against his mortgagee.

8. This case distinguished from *Scott* v. *Montgomery*, 10 *S. C.*, 449.

Before KERSHAW, J., Chester, March, 1883.

The opinion fully states the case. The Circuit decree was as follows:

This action was tried before a referee, and was heard by me upon exceptions to his report, taken by the defendants, Julia L. Hardin and the clerk. The plaintiffs, as assignees of a bond and mortgage given by the defendant, Julia L. Hardin, *née* Stroud, before her marriage, to George W. Melton, now deceased, upon the land described in the complaint, seek to foreclose the same. Macoy, the former clerk, was made a party, because as clerk he held a prior mortgage of the same land.

Mrs. Hardin resists the foreclosure upon the ground that she had paid the debt in part, and had provided Melton, the mortgagee, with means sufficient to pay the balance, before the trans-

fer of the bond and mortgage to the plaintiffs, and that they are liable to account for said payments and funds in settlement of the mortgage, in the same manner and to the same extent as Melton would be if he were the present holder of the bond and mortgage seeking to foreclose the same. She also claims that at the time of the purchase of the land for which the mortgage was given by her to Melton, he was her trustee, and that she is entitled to set aside the transaction, and does elect to set it aside, on account of the fiduciary relation existing between them. As to this latter · contention, it is sufficient to say that the mortgage having been executed on the 22d day of May, 1874, nearly nine years ago, and she having enjoyed the benefit of the purchase during all that time, it is too late to avail herself of that defence, however it may aid the court in solving the question of fact involved in the other branch of the case.

Before entering upon the consideration of the merits of the defence, there are questions relating to the competency of witnesses to be disposed of. First, as to Mrs. Hardin. I have no doubt that her testimony as to her transactions with the deceased Melton, as whose assignees the plaintiffs claim, was properly excluded by the referee. The exception of the defendant on this ground is therefore overruled.

Next, as to the testimony of Macoy, as to communications made to him while clerk by Mr. Melton. I consider that he was competent. He had no interest whatever that could be affected by the result of the present suit. He was made a party as the officer of the court, holding securities for litigants—a merely formal party. He has ceased now to be a party at all, having been succeeded in office, and in the technical ownership of the mortgage, by reason of which he was originally made a party. His examination, or any judgment or determination in this action, can in nowise affect his interest or the interest heretofore owned or represented by him; hence the code (Section 400) will not exclude him. Moreover, plaintiffs themselves examined Macoy on their own behalf, touching declarations of Melton, and transactions with him, the effect whereof was to waive the objection previously made by them to his competency.

Plaintiffs also objected to the competency of Mr. Hamilton to

testify to the declarations of Melton, and transactions between him and Mrs. Hardin, upon the ground that they were confidential communications between client and attorney. It is not very clear *who* was Mr. Hamilton's client at the time. Plaintiffs, in the argument upon other parts of the case, insist that he was the attorney of Miss Stroud, while the referee seems to regard him sometimes as her attorney, and at other times as the attorney of both her and Melton. For the purpose now under consideration, however, it is immaterial who was his client. Communications made by Melton in the presence of Miss Stroud are not privileged, and cannot be excluded. *Whart. Evid.*, § 587. If it had been otherwise, the objection could only have been made by Melton, or for the protection of his interests by his personal representatives. *Ibid*, § 584.

The objection that Hamilton's testimony tended to vary the written contract to which he testified is not tenable. He was the subscribing witness to the deed, and was competent to testify to the conversation between the parties at the time it was executed. *Spencer* v. *Bedford*, 4 *Strobh.*, 96. The testimony was explanatory of the transaction. It does tend to show that no money passed between the parties, but the receipt which it appears to contradict had not been produced at the time the objection was made. But if it had been, the testimony would have been admissible. *Trimmier* v. *Thomson*, 10 *S. C.*, 190. I therefore conclude that Mr. Hamilton's testimony was properly admitted by the referee.

These preliminaries being disposed of, the case will be considered upon its merits. The result depends upon the degree of credit to be attached to the testimony of Major Hamilton. He is the only witness to the negotiations between Mrs. Hardin and Mr. Melton whose lips are not sealed. Mr. Melton is dead, and Mrs. Hardin has been excluded from testifying under plaintiffs' objection. Mr. Hamilton's testimony has been put aside by the referee as unworthy of credit, on two grounds: first, because of his failure of memory in relation to the receipt given by Mrs. Hardin to Melton on the day of the settlement; and next, because the settlement itself was considered by the referee "*strange*," and presumably improbable.

I do not find in either of the reasons assigned just cause for discrediting the testimony of a gentleman holding high position at the bar, unimpeached in any respect, intelligent, disinterested, having every opportunity of knowing the facts, and testifying positively. If the testimony of such a witness must be set aside as unworthy of belief, because he is shown to have forgotten one of many circumstances connected with the transactions to which he testifies, we should have little human testimony worthy of credit.

The discrepancy is shown thus: Mr. Hamilton, being cross-examined, said: "On the day the note and mortgage were executed, Miss Julia L. Stroud never, within my knowledge, receipted Melton for $1,214.11, due by him as trustee, as ascertained by the court." In the reply, plaintiffs produced and proved a receipt in Maj. Hamilton's handwriting, signed by Julia L. Stroud, acknowledging the receipt from Mr. Melton of the sum of $1,245.24, in full settlement of the said sum reported against him, &c. It might have been more satisfactory if Mr. Hamilton had been shown this receipt, and examined in reference to it, when he was on the stand, rather than to have led him on to deny any knowledge of the paper, and then confront him with it in reply. The judicial mind seeking for truth would have been more favorably impressed had the other course been pursued.

As it is, however, it is not charged upon Mr. Hamilton that he is thereby placed under any worse imputation than that of having forgotten an important fact involved in the transaction. It is possible that this apparent contradiction or lapse of memory might have been explained by Mr. Hamilton, had he been allowed the opportunity after the production of the receipt. He offered to go upon the stand and testify, but it was objected to, and the matter must remain as presented, to wit, that a paper is shown to exist, of which he had once had knowledge, but which he had forgotten at the trial. Yet I cannot agree with the referee, that the testimony of a credible and disinterested witness is to be disbelieved as to those matters which he swears he *does* remember, because of the existence of some other fact connected with the transaction which he does not remember.

Nor do I consider the improbabilities of Mr. Hamilton's state-

ment so great as to throw doubt upon it. It appears to me less improbable than the hypothesis advanced by the plaintiffs. Mr. Melton had purchased the land in question for Mrs. Hardin, and at her request, paying therefor part cash, and securing the balance by his own bond and mortgage, while Mrs. Hardin was in possession of the land and enjoyed its benefits. Mr. Melton owed her $1,214.00, and there would be also due to her from the proceeds of the land sales a sufficient sum to pay, or nearly to pay, the price of the land, when the amount due to her by Mr. Melton had been applied. According to Mr. Hamilton's testimony, on May 22, 1874 (the land having been sold in December previous), Mr. Melton sent for him. He found him in company with Miss Julia L. Stroud (Mrs. Hardin). Mr. Melton requested him to draw the note and mortgage which is the subject of this suit. He did so, and returned with the papers to Mr. Melton's office, where he found Miss Stroud, Melton, and W. D. Simpson. At the time of, or immediately preceding, the execution of the papers, Melton stated to Miss Stroud that the court had ascertained that he (Melton) was indebted to her some $1,200, and that there would be a sum of money coming to her from the clerk of the court, and he was confident these two sums would be sufficient to pay for her purchase of these two tracts of land; that as he had paid the cash portion of the purchase, and it was not certain what sum would be coming from the clerk of the court, he would get her to execute the note and mortgage for his protection, and if it should turn out, after a settlement with the clerk, that the amount due by him and coming to her from the clerk, would be sufficient to pay the bonds given by him for the purchase money, he would cancel the note and mortgage; if not, he would give her credit for as much as the two sums amounted to.

At that time the note and mortgage were executed, and Melton gave his deed, with the usual warranty, to Miss Stroud, conveying the mortgaged premises, Mr. Hamilton being a subscribing witness thereto. At the same time she gave to Mr. Melton her receipt for the balance due her by him as trustee, and her release of him as trustee. These were dealings between a trustee and his *cestui que trust*, a young lady said at the trial to have recently come of age. He had written her a letter a short time

before, seeking to impress her with the idea that some one or more persons were trying to cheat her out of her interest, claiming credit for defeating them, enjoining secrecy as to their correspondence, and warning her against "outside influences," &c.; whereas nothing has been made to appear showing that any one was trying to injure or get any advantage over her. He was evidently seeking to establish an influence over her, to the exclusion of all others, and there is no reason to doubt that he had her entire confidence.

It was his duty, under the circumstances, to protect her interests against all the world, and to have acted out honorably the *rôle* he had assumed towards her. If he had looked to *her* interest, he would have transferred his bid to her for the purchase of the land and paid the cash portion of it out of the funds in his hands as trustee, to which she was entitled. Or he would at least have shown some reason why that was not done. Giving to Mr. Hamilton's testimony due credit, he paid her nothing, but undertook to account to her for the amount for which she receipted to him, upon her note and mortgage. He ought to have given her credit *then* for that amount, but he used it to obtain his discharge as trustee, and held the note and mortgage open against her. When the next instalment became due on the land purchase in December, 1874, he took from her an assignment of the amount which might be coming to her out of the estate in the hands of the clerk. He paid that instalment out of his own funds and assigned her note and mortgage, and the assignment of the funds in the clerk's hands, to the plaintiffs, without giving her credit for anything, and without notice to her.

These dealings on the part of Mr. Melton, his further assignment of the collaterals to Irwin, hereafter mentioned, and his subsequent insolvency, indicate that he was then in failing circumstances and anxious to secure the control of all the credits possible. The plaintiffs seek to overcome the testimony of Mr. Hamilton by producing the receipt of Miss Stroud and an assignment by Mr. Melton to her of a note of Joseph Stroud, secured by a mortgage on mules, which assignment bears date May 22, 1874. This paper is produced by plaintiffs, and there is absolutely no testimony to connect Mrs. Hardin with it. It is fair

to conclude that Melton intended to give her that paper in order to secure her in some way in regard to these transactions, but there is no evidence which will authorize the conclusion that it was ever delivered to her, or that she accepted it on account of what Melton owed to her. Why should she do so, and leave her mortgage standing open? The referee finds that Melton paid her the amount due her by the transfer of this paper and the cash paid by him on the land purchase, which was $733.19; yet he does not find that Mrs. Hardin is entitled to credit for the amount so paid to Melton. Her note to Melton was for the entire price for which he bid off the land, including the cash portion paid by him; and when she paid him, as the referee finds, the cash advanced by him and paid on the land, she was certainly entitled to credit for that amount.

But the assignment of the note and mortgage of J. L. Stroud cannot be inferred to have been received by Mrs. Hardin, there being no evidence of her acceptance of it. The presumption would rather be, that she had declined to take it, and that Melton had delivered it to plaintiffs (who produce it without explanation) among the other securities transferred to them. If Mrs. Hardin did not accept the assignment of that note and mortgage as cash from Mr. Melton, then it is clear that she is entitled to have credit for the whole amount due her by Melton as her trustee, and for which her receipt was given him, to wit, $1,214.00, of the date of the note and mortgage, May 22, 1874. The receipt was given for $1,245.24, but that included Melton's commissions.

The referee has been led away by the doctrine applicable to purchasers for valuable consideration without notice. That doctrine has no application whatever to the purchase of unnegotiable notes and securities. These plaintiffs, as assignees, stand in all respects in regard to this mortgage as Melton stood at the time of the transfer, and are bound by all the equities which then existed between Melton and Mrs. Hardin, affecting the mortgage debt. It is wholly immaterial whether they had notice or not. If it had not been, I would have held that there was sufficient to put them upon the inquiry. But it is not worth while to go into that question, for plaintiffs took these securities absolutely without prejudice to any set off or other defence existing

at the time of or before notice of the assignment. Authorities might be multiplied upon this point, but it is sufficient to say, *ita lex scripta.   Code of Procedure*, Sec. 133.

This provision of the law also excludes the application of the doctrine of estoppel, which was invoked for the protection of the plaintiffs.    The exceptions taken on behalf of the clerk must also be sustained.   It was manifest error in the referee to recommend that the plaintiffs be allowed the relief demanded in the complaint, without providing for the balance due on the first mortgage in the hands of the clerk of the court.

Since the hearing by the referee, a petition has been entered by T. J. Irwin, asking to be made a party, and that he be decreed to be paid any balance that may remain after satisfying the demands of the plaintiffs out of the mortgaged property. He claims as assignee of the receipt of the plaintiffs which Mr. Hemphill gave to Mr. Melton for the collaterals.   Irwin has been made a party by an order of the court, and is entitled to the relief he demands, if there should be anything remaining due after satisfying plaintiffs' demand.

It is therefore adjudged and decreed, that the defendant, Julia L. Hardin, be credited upon her note and mortgage in the hands of the plaintiffs with the sum of one thousand two hundred and fourteen dollars and eleven cents ($1,214.11), as of the date of the same, May 22, 1874; that the said Julia L. Hardin pay the balance due to the clerk of the court upon the bond and mortgage of the same premises, given by George W. Melton, and set up in the answer of Mr. Macoy, as clerk; that upon such payment being made, she have further credit upon her note and mortgage held by plaintiffs, for the amount so paid to the clerk; that in the said payment to the clerk of the court, she be allowed the proportion to which she is entitled, out of the funds and securities in the hands of the clerk, arising from the sales of the land of the estate of Dr. William Wylie; that if anything remain due by her after the application of the credits aforesaid to her note and mortgage, she pay the same to the plaintiffs, or so much thereof as will satisfy the debt of G. W. Melton to plaintiffs, for which they hold the said note and mortgage as collateral security, they crediting the note and mortgage to the extent of such pay-

ment; that if any balance be then due on her said note and mortgage, the said Julia L. Hardin pay the same to T. J. Irwin, and that her note and mortgage be thereupon satisfied and discharged, and satisfaction thereof be entered upon the records by the clerk of the court, and the said note and mortgage be delivered up to the said Julia L. Hardin.

That upon the failure of the said Julia L. Hardin to pay the said sums of money, or any of them, as required by this decree, on or before the first day of September next, the said Julia L. Hardin be thereafter forever foreclosed and barred from all title, claim, and equity of redemption in the premises described in the complaint, and that the same be sold by the sheriff of Chester County, after due advertising, on the first Monday in October next, or on some convenient sales-day thereafter, for cash, and that he do pay from the proceeds of said sale, first, the costs of these proceedings, and then the amounts herein ordered and decreed to be paid by the said Julia L. Hardin; the clerk allowing, in the payment to be made to him, credit as hereinbefore directed to be allowed to the said Julia L. Hardin, in case the settlement be made by her, for the amounts to which she is entitled, in the estate of Dr. William Wylie, deceased, in his hands.

That if this decree be complied with by the said Julia L. Hardin, by the payment of the said sums, and the mortgaged lands be not sold, the said Julia L. Hardin pay the costs of this action.

That the report of the referee herein be reversed, so far as it conflicts with this decree.

That the said referee ascertain and report, as soon as may be, the sums of money required to be paid by Julia L. Hardin, under the terms of this decree, and that the payments herein ordered to be made, conform to the amounts to be ascertained by the said report.

*Messrs. John J. Hemphill* and *A. G. Brice*, for appellants.

*Mr. S. P. Hamilton*, contra.

November 14, 1884.   The opinion of the court was delivered by

MR. JUSTICE MCGOWAN. This was an action to foreclose a mortgage on two tracts of land, called for convenience C and D, executed by Julia L. Stroud, now Julia L. Hardin, to one George W. Melton, on May 22, 1874, to secure a note under seal of same date, given to the said Melton, for $2,204.08¾, due January 1, 1875, with interest. On June 22, 1875, the said Melton borrowed money from Mr. James Hemphill, acting for himself and Mrs. Moffatt, and gave him two notes, one payable to Mrs. Moffatt, for $1,500, and the other payable to James Hemphill, for $1,000, and to secure these notes assigned and transferred the note and mortgage of Miss Stroud, to foreclose which this action was brought, making also a party defendant G. W. Curtis, clerk of the court, who, as clerk, held a senior mortgage on the said lands, to be more fully explained hereafter. The defence was that the note and mortgage were not due, but had been substantially paid, and should have been marked satisfied, at least to a large extent, before Melton, the payee, assigned them to the plaintiffs.

The cause was referred to W. A. Sanders, Esq., as special referee, when the facts appeared, of which the following is a general outline : Miss Julia L. Stroud had an interest under the will of Dr. William Wylie, of which George W. Melton was appointed trustee. A proceeding was instituted to settle the estate, entitled *Alexander P. Wylie, executor,* v. *George W. Melton, trustee.* In this cause there was an order of sale, by authority of which, besides other property, the tracts of land C and D were sold December 1, 1873, and bid off by George W. Melton at the aggregate price of $2,199.58. The terms of sale were complied with by Melton, who made the payment required in cash and took title from the clerk, who made the sale, and mortgaged the lands back to him to secure the remainder of the purchase money. The allegation is, that this purchase was made by Melton, trustee, for Miss Stroud, who immediately went into possession of the lands.

On May 20, 1874, the report upon the accounts of Melton, trustee, was filed, by which it appeared that, for rents of land, personalty, &c., he was indebted to Miss Stroud in the sum of $1,214.11; and a few days thereafter, May 22, 1874, Melton

executed a conveyance of C and D to Miss Stroud, and took from her the note and mortgage for the whole purchase money, which he afterwards assigned, and are in contention here. Although the account against Melton had not then been confirmed, yet he took from Miss Stroud at that time a receipt in full for the amount ($1,214.11) which the report showed he owed her.

Afterwards, on June 1, 1874, the account was confirmed by order of court, which provided, "that upon the payment of the sums of money reported due by the trustee to his *cestui que trusts,* Mrs. M. J. Wylie and Miss Julia Stroud, and the production or the filing of the receipts from one or more of them, or the payment of the said sum of money into court, that said George W. Melton be released and discharged from his said trusts." Three days after this order was passed, June 4, 1874, Melton produced the receipt previously taken, and filed it in the office of the clerk, taking from him (the clerk) a receipt for the same, which stated that it was "in full release of her said trustee, as provided by the order of court, June 1, 1874."

On December 23, 1874, Miss Stroud gave to the clerk of the court an order directing him to pay to Melton "all moneys in his hands as clerk of the court at any time due in the above stated case (*Wylie* v. *Melton*), and take a receipt from the said George W. Melton for the same." Accepted by the clerk, "to be paid when in funds applicable thereto." There was at that time no money in the clerk's hands due to Miss Stroud, but on the assumption that Melton would pay the remainder of his land bonds, there would be in his hands for her the sum of $961.15, and this must have been the anticipated funds upon which that order was given. This order (known in the proceedings as "assignment G") was taken out of the clerk's office and assigned by Melton to the plaintiffs as further collateral security for the money borrowed as aforesaid.

It appeared also that one of the attorneys for the plaintiffs found in the record of the case (*Wylie* v. *Melton*) in the clerk's office a mortgage of one Joseph H. Stroud to George W. Melton, February 3, 1873, covering sixteen mules and horses, to secure a note from $874. There were endorsements on the paper, showing that Melton himself had sold most of the mules and horses.

This mortgage had on it an assignment, "without recourse," by Melton to Miss Julia L. Stroud, but there was no proof that the mortgage was worth anything, or had ever been delivered to Miss Stroud, or any other evidence whatever concerning it.

In July, 1876, George W. Melton died intestate and insolvent, and the plaintiffs, after crediting what they could realize from his estate, which left still a balance unpaid of about $2,300, as assignees instituted this proceeding to foreclose the mortgage against Julia L. Hardin, impleading also G. W. Curtis, successor . of Macoy, as clerk of the court, who held officially unpaid balances of the senior mortgages on the lands C and D, executed for the purchase money by George W. Melton, while the legal title to the same was in him under the clerk's deed.

Mrs. Hardin was excluded under section 400 of the code from testifying to any agreement or transaction with Melton, when the note and mortgage and receipt and assignment G were placed at his disposal. But C. C. Macoy, the then clerk, testified (subject to objection), "that C and D were sold to Mr. Melton, and when I called upon him to comply, he objected until he could see Miss Stroud, his reason being, to the best of my recollection, that he had bid off the lands at the sale for her, and there being some money transactions between them, the matter would have to be delayed until he could see her.   *   *   *   *   At the time the assignment G was lodged with witness, there was no fund in court for Miss Stroud. It was lodged with me, to the best of my recollection, on the day it bears date. My recollection is that assignment G was taken out of the office and never returned. I do not recollect who took it out.   *   *   *   *   I applied to Mr. Melton to pay the instalment .on these bonds several times. He claimed that he had money coming to him from Miss Stroud, then in the office under this assignment G, and that it should be applied to the bonds, and that it was unnecessary for him to pay the money into court. Witness said if these bonds had been paid in full, there would have been due Miss Stroud $961.15."

S. P. Hamilton, Esq., testified (subject to objection) as follows : "I drew the note made by Julia Stroud, payable to George W. Melton, also the mortgage taken to secure it. I am a witness to the mortgage. The suit of *Wylie, executor,* v. *Melton, trustee,*

had been concluded, so far as the litigation was concerned. In
that litigation I represented George W. Melton, trustee, and Miss
Stroud. On April 4, 1873, the court, by its order, required the
trustee to pay me a fee of $200 for my compensation in and
about the litigation of the trust estate. * * * * On May
22, 1874, I was sent for by Mr. Melton to come to his office in
the town of Chester. I found Miss Julia L. Stroud there. Mr.
Melton requested me to draw the deed and the note and mort-
gage, which are the subject of this suit. I received no fee for
this, other than I received under the order of court. I returned
after the papers were drawn and found Miss Stroud and Mr. W.
D. Simpson there in Melton's office. At the time, or immedi-
ately preceding the execution of the papers, Melton stated to
Miss Stroud that the court had ascertained that he was due her
as her trustee some $1,200, and that there would be a sum of
money coming to her from the clerk of the court, and that he
was confident that these two sums of money together would be
sufficient to pay for the purchase of the two tracts of land. He
said that as he had paid the cash portion of the purchase, and
that it was not certain what sum would be coming from the clerk
of the court, he would get her to execute the note and mortgage
for his own protection, and that if it should turn out after a set-
tlement with Macoy, the clerk, that the amount due by him and
the amount coming from the clerk, would be sufficient to pay the
bonds given by him for the purchase of the lands, that he would
cancel the note and mortgage; if not, he would give her credit
on the note and mortgage for as much as the two sums of money
came to," &c.

The plaintiffs objected to this testimony on the ground that
Major Hamilton was acting as the attorney of Mr. Melton, and
he was not at liberty to disclose such communications; and also
because the testimony tended to vary written contracts made at
the time. The testimony was taken subject to objection.

On the cross examination the witness stated: "I do not know
of Melton's turning over money or valuable assets on the day the
note and mortgage were executed. Miss Julia L. Stroud never,
within my knowledge, receipted Melton for the $1,214.11, due
by him as trustee, as ascertained by the court," &c. In reply

the plaintiffs offered the receipt of Miss Stroud to George W. Melton for the sum of $1,245.24 (commissions added), "in full settlement of said sum reported against him as trustee in the case of *A. P. Wylie, executor,* v. *George W. Melton, trustee,*" &c. This receipt was in the hand-writing of Major Hamilton. The defendants claimed the right to reply, which would have given an opportunity for explanation, but the referee ruled that the plaintiffs had the reply, and no testimony was admissible after they had concluded.

The referee held that the agreement between Melton and Miss Stroud at the time the papers were executed indicated in the testimony of Macoy and Major Hamilton was not established by satisfactory proof, and recommended that the relief demanded should be granted, and the mortgage foreclosed for the whole amount remaining due upon the notes. Exceptions were filed to this report by Mrs. Hardin and the clerk, G. W. Curtis, and upon the hearing, Judge Kershaw reversed the findings of the referee, and recommitted the report, with instructions that "Mrs. Hardin should pay the balance due to the clerk of the court upon the bond and mortgage of the same premises given by Geo. W. Melton, and set up in the answer of Mr. Macoy as clerk; that upon such payment being made, she have credit upon her note and mortgage held by plaintiffs for the amount so paid to the clerk, and that in this payment she be allowed the proportion to which she is entitled out of the funds and securities in the hands of the clerk arising from the sales of the lands of the estate of Dr. William Wylie; that Mrs. Hardin be also credited upon her note and mortgage in the hands of the plaintiffs with the sum of $1,214.11, as of the date of the same, May 22, 1874; and that if anything remained due by her after the application of these credits on her note and mortgage, she pay the same to the plaintiffs, or so much thereof as will satisfy the debt of G. W. Melton to the plaintiffs," &c.

From this decree the plaintiffs appeal to this court upon the following exceptions:

1. "Because his honor held that the testimony of C. C. Macoy as to communications between himself and G. W. Melton was competent and admissible.

2. "Because he held that the examination of Macoy by the plaintiffs was a waiver of the objection to his testimony made by them.

3. "Because he held that the testimony of S. P. Hamilton, Esq., was properly admitted by the referee, and that it did not tend to vary the written contract between Mrs. Julia L. Hardin and Melton.

4. "Because he holds that Melton bought the land described in the complaint for Mrs. J. L. Hardin, and at her request.

5. "Because he holds there is no testimony to connect Mrs. Hardin with the mortgage of Joseph H. Stroud on certain mules, and the plaintiffs produced it without explanation.

6. "Because he holds that plaintiffs are bound by all the equities existing between Melton and Mrs. Hardin, even without notice of them; that the plaintiffs had sufficient notice to put them upon inquiry, and that Mrs. Hardin cannot be estopped by her conduct.

7. "Because he adjudges and orders that Mrs. Julia L. Hardin be credited upon her note and mortgage in the hands of the plaintiffs with $1,214.11, as of date May 22, 1874.

8. "Because he orders and adjudges that Mrs. Hardin pay to the clerk the balance due on the bond and mortgage of Melton to the clerk of the court, and that such payment be entered as a credit on her bond and mortgage held by plaintiffs.

9. "Because he orders and adjudges that in the payment to the clerk of the court, Mrs. Hardin be allowed the proportion to which she is entitled out of the funds and securities in the hands of the clerk arising from the sales of the lands of Dr. William Wylie.

10. "Because he orders that Mrs. Hardin pay plaintiffs the balance only, if any, due on her bond and mortgage, after allowing the above credits, or so much of said balance as will satisfy the debt of Melton to them; and that the overplus, if any, due on her note and mortgage be paid to T. J. Irwin, and that thereupon her note and mortgage be marked satisfied and discharged, and delivered up to her, and satisfaction entered on the record.

11. "Because he reverses the referee's report so far as it conflicts with his decree herein.

12. "Because he did not adjudge that the plaintiffs were entitled to an order of foreclosure and sale and judgment against Mrs. Julia L. Hardin for the balance, if any, due after application of the proceeds of the sale to their debt," &c.

*First.* In regard to the preliminary question as to the admissibility of the evidence. The testimony of Mr. Macoy as to conversations with Melton, who is now dead, was objected to as inadmissible under section 400 of the code. It is true that he was once a party, made so by the plaintiffs for the reason that as clerk he held officially a senior mortgage on these same lands. We suppose that in any event that mortgage would have to be first paid, and that he really had no interest in the event of the suit. He could not be made incompetent to testify by simply being made a party defendant. This court has lately held that section 400 of the code did not exclude those who were competent to testify before its passage; that the word "affect" should be construed in the sense of "promote the interest of said witness"; and that if the evidence of the witness does not tend to promote his interest, he is competent, whether he is a party or not. *Robinson* v. *Robinson*, 20 *S. C.*, 570.

Besides, as the Circuit judge says: "He was made a party as the officer of the court holding securities for litigants, a merely formal party; and he has now ceased to be a party at all, having been succeeded in office and in the technical ownership of the mortgage by reason of which he was originally made a party. His examination or any judgment or determination in this action can in nowise affect his interest or the interest heretofore owned or represented by him. Moreover, plaintiffs themselves examined Macoy on their own behalf, touching declarations of Melton and transactions with him," &c.

*Second.* The plaintiffs also object to the competency of Major Hamilton to testify as to the declarations of Melton and transactions between him and Mrs. Hardin, upon the ground that they were confidential communications between client and attorney. It is a wise rule to hold professional communications privileged, but it does not follow that everything which passes between parties in the presence of a lawyer must be regarded as communications made to him under the seal of confidence. It has been

held that privilege does not protect statements made to the counsel in the presence of third parties, such persons not being concerned in a confidential communication. 1 *Whart. Evid.*, §§ 587, 588. We do not understand that the arrangement between Melton and Miss Stroud as to the use to be made of the papers executed was in the nature of a communication *to* the counsel. He was in no way consulted about it, but in preparing the papers as requested, he was present and happened to hear the agreement between them. There could be nothing confidential or secret in its nature about an honest agreement between parties. Major Hamilton signed the mortgage as a witness, and that entitled him to state the conversation which occurred at the time. *Spencer* v. *Bedford*, 4 *Strobh.*, 96:

Besides, it seems to us that if he was present as counsel for any other purpose than the preparation of the papers, he was counsel for both parties. In the litigation then just ended, out of which the business arose, he had represented the trust estate, and in doing so represented both the trustee and *cestui que trust.* For that service he had been paid from the trust estate, and he prepared those papers between trustee and *cestui que trust* as a supplemental matter, without further charge. Mr. Brice, in his admirable argument for the plaintiffs, properly admitted that if Major Hamilton were counsel for both, his testimony could not be excluded on that ground. If one of two parties to a verbal agreement abuses the confidence of the other, who is excluded from testifying, it would certainly be unfortunate if a person who happened to hear the agreement should also be excluded for the reason that he was a lawyer present, preparing the papers at the instance of both. "In regard to the person to whom the communications must have been made in order to be thus protected, they must have been made to the counsel, attorney, or solicitor acting for the time being in the character of legal adviser." 1 *Greenl. Evid.*, § 239.

Nor do we regard this testimony as inadmissible on the ground that it tended to vary the terms of written instruments. The purpose manifestly was not to vary the terms of the papers, but to explain the uses to be made of them and the conditions of their existence; as stated in the case of *Kaphan* v. *Ryan*, 16 *S. C.*,

357, "to show the whole agreement in which they originated and of which they constituted only a part." It is said in 1 *Greenleaf's Evidence*, § 284, that the rule does not apply to the admission of parol evidence in cases where the original contract was verbal and entire, and a part only was reduced to writing. *Lewis* v. *Gray*, 1 *Mass.*, 297 ; *Knight* v. *Knotts*, 8 *Rich.*, 35 ; *McGrath & Byrum* v. *Barnes*, 13 *S. C.*, 332.

Besides, a receipt is not one of those solemn papers in writing as to which parol evidence is not admissible, but is always capable of explanation. "In itself a receipt does not express the terms of any contract or uniting of the minds of the parties between whom it has passed, but merely indicates, by way of admission, the fact stated in it; consequently it is not governed by the rule which prescribes the effect of instruments adopted by parties as the special means of evidencing some compact or understanding had between them, but, like evidence not enjoying any special privilege, it is capable of being contradicted or modified by other classes of evidence." *Heath* v. *Steele*, 9 *S. C.*, 92.

*Third.* Then as to the merits of the case, the evidence being admissible. If this question were between these defendants and George W. Melton, or his personal representative, it seems to us that there could be little doubt about it. It is clear, not only from Melton's letter, but from the testimony of Macoy and the acts of the parties, that the lands were bid off for Mrs. Hardin. They were most likely bought for her for the reason that she had money due to her from the estate, and she went into immediate possession. Neither Melton, who is dead, nor Mrs. Hardin can testify upon the subject ; but from anything that appears, we are unable to reach the conclusion that Melton, on the day the note and mortgage were signed, had a settlement with Mrs. Hardin and paid her what he owed her as trustee, and advanced her the money for the order upon the clerk, not given until long after, leaving the whole of the note and mortgage due to himself personally. The undisputed record facts of the case would seem to indicate that lands purchased for Mrs. Hardin from the estate of Dr. William Wylie should be paid for out of money due to her from that estate.

It does not seem to us probable that Melton, a man in busi-

ness, and evidently needing all the money he could raise, should pay for lands bid off for his *cestui que trust* out of his private means, and give her credit for the advance as an investment, when at the same time he owed her in the very matter of the estate, money about enough to pay for them; and it would seem to be still less probable that Mrs. Hardin should encumber her newly acquired lands to secure the purchase money, when there was lying to her credit in the case in which they were sold money to pay for them. It would require strong proof to make it appear that any such settlement was made, and that Mrs. Hardin received the money.

But instead of such full proof, there is really none, except what may be fairly inferred from Melton's possession of the receipt for $1,214.11 and the order on the clerk given long afterwards; for we cannot give to the little balance of the chattel mortgage, found in the record assigned to Mrs. Hardin, the importance claimed for it. There is no evidence that it had any value, or that Mrs. Hardin ever had knowledge of its existence, and it is therefore impossible for us, simply from the fact that it was found in the record, to infer that Melton that day had a full and final settlement with Mrs. Hardin, in which he paid her as *cestui que trust* what, as trustee, he owed her, without using in any way what the record showed he owed her as trustee. If such settlement were made, it is very unfortunate that there was no record of it.

But when we take into consideration the testimony of Mr. Macoy and Major Hamilton, the matter is made intelligible, in accordance with what would seem to be the probabilities of the case. As it seemed reasonable that Mrs. Hardin left with the clerk her order in favor of Melton (assignment G) in order to enable him to set off that fund against the land bonds, so Mr. Macoy says Melton informed him. As we would suppose in advance that Mrs. Hardin would use the money due to her from Melton in paying for her lands, and had given him the control of the receipt for that purpose as soon as the account against him was confirmed by the court, accordingly Major Hamilton states that such was his distinct undertaking "at the time, or immediately preceding the execution of the papers." Surely the tes-

timony of a gentleman so respectable as Major Hamilton should not be disregarded only for the reason that, in respect to a transaction which took place some seven or eight years before, he had forgotten that on the occasion referred to a receipt was actually given, especially as his testimony is in exact conformity to the view suggested as probable by all the circumstances of the case. We think that as against Melton himself, or his personal representative, the defence made should prevail.

It is said, however, that this is not an action to enforce these securities by Melton, or his personal representative, but new parties have been introduced; that Melton, without making the proper credits on the note and mortgage, assigned them for full value and without notice to the plaintiffs, who are now entitled as innocent purchasers to enforce them in the condition in which, as assignees, they received them, without regard to the omission of Melton to credit them in accordance with his agreement. This would certainly be true if the securities were negotiable in their nature, and had been transferred before due for full value, and without notice.    See the recent case of *First National Bank of Parkersburg* v. *Johns*, 46 *Amer. Rep.*, 516, where a great number of the authorities are collected.

But the bond and mortgage assigned here were not negotiable securities transferred before due, but mere choses in action, and very different principles apply.    They are not subject to the doctrines of implied warranty and of purchaser for valuable consideration without notice.    *Maybin* v. *Kirby*, 4 *Rich. Eq.*, 116. The books are full of cases upon the subject, but we are not aware that the general doctrine is anywhere stated with more clearness than by Judge Butler in the case of *Hodges* v. *Connor*, 1 *Speer*, 123: "This case, according to the legal character and purport of the paper sued on, must be regarded as a contest between the original parties to it.    That is, the intermediate holders have acquired no higher rights, nor should they occupy any better position than the original payee."

This principle has been expressly embodied in section 133, Revised Code, which declares that, "In the case of an assignment of a thing in action, the action by the assignee shall be without prejudice to any set-off or *other defence existing at the time*

*of*, or before notice of, the assignment; but this section shall not apply to a negotiable promissory note or bill of exchange transferred in good faith and upon good consideration before due."

Nothing could be plainer or more positive than this provision. As we understand it, the debtor, in executing such securities, gives no authority expressly or impliedly in fact or in law, that they may be sold at all; and if they are sold, the purchaser is notified by the law that he takes them at his peril under the principle of *caveat emptor*.

So far as the debtor is concerned the doctrine of estoppel cannot displace this positive provision of express law. We suppose that under certain circumstances he might be estopped from denying that he uttered the security or matters of that kind, which would avail the payee as well as any subsequent holder, but he cannot be estopped from setting up any defence against the holder, which would be good against the payee himself. This results from the nature of the security. The law so declares in terms. Mr. Pomeroy does say that, in reference to certain kinds of securities, such as certificates of stock, which are of a quasi negotiable character, the doctrine of estoppel has been held to apply in certain cases between assignor and assignee; but he denies its application between the debtor and assignee. After discussing the whole subject he sums up as follows: "All defences, either legal or equitable, in favor of the debtor himself against the original creditor at the time of the assignment, or of notice to him of the assignment of a non-negotiable thing in action, will avail against the assignee, who seeks to enforce the demand against such debtor," &c. *Pomeroy's Rights and Remedies*, § 162.

But it is still further strongly pressed upon the court that there is a general principle in the law applying to all cases, "that when one of two innocent parties must suffer, he by whom the loss was occasioned must suffer;" and that the inexcusable negligence of Mrs. Hardin in parting with the control of the receipt and order on the clerk put it in the power of Melton to do an injustice to innocent parties, and she ought to suffer the consequences; and the case of *Montgomery* v. *Scott*, 10 *S. C.*, 449, is relied on to sustain the proposition. We think this case

differs from that in several very important particulars.  In that case the alleged mortgagor brought the action to set aside the mortgage itself on the ground of fraud and imposition in obtaining her own signature.  Here the mortgagor does not deny the existence of the mortgage, but insists, by way of defence, that the mortgagee undertook to make certain credits upon it, which he did not make.  In that case the question was whether the mortgagor was guilty herself of negligence in failing to take proper precaution against signing a paper not intended; here the alleged negligence of the mortgagor is not in her signing the mortgage, but in trusting the matter of credits to her friend, the mortgagee, who abused that confidence.

It would certainly have been better if the credits had been endorsed at the proper time, when Melton was furnished with the means of doing so; but in considering the matter of negligence we cannot overlook the relations that the parties held to each other as trustee and *cestui que trust*.  They were not on equal terms in the matter.  The confidence of Mrs. Hardin was natural, but, as it turned out, misplaced.  The fault was that of Melton in not endorsing the proper credits at the proper time, and we have already held that as against him or his estate, the credits should now be allowed.  It seems to us that in any view the over-confidence or want of caution of Mrs. Hardin cannot be considered as reaching beyond the law involved in the nature of the securities.

It is not claimed that she authorized the assignment.  The utmost that can be said is, that the absence of the credits enabled Melton to assign them.  Even if that unauthorized act of his could be regarded in any proper sense as caused by her omission to have the credits endorsed, yet that assignment could not be so made as to escape the public well known law, which declares that it was subject to all defences against the original payee.  The securities were fair upon their face, without credit or endorsement, and the plaintiffs were misled.  That they should lose their money is matter of the sincerest regret, but from our view of the facts and the law, we are constrained to hold that the defendants are entitled to have the credits entered, as directed by the Circuit judge.

The judgment of this court is that the judgment of the Circuit Court be affirmed.